**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

In re COINMINT, LLC.          )        C.A. No. 2019-0983-MTZ

**ORDER GRANTING JUDGMENT IN FAVOR OF RESPONDENT AND VACATING STATUS QUO ORDER**

WHEREAS, the Court, having considered Petitioner Mintvest Capital Ltd.'s ("Petitioner" or "Mintvest") claims and the record developed at trial, as well as the parties' briefing and various motions, it appears as follows:[1]

A.     This action concerns the governance and domestication of Nominal Respondent Coinmint, LLC ("Coinmint" or the "Company"). Coinmint is a private Bitcoin mining firm that operates one of the largest digital currency centers in the world.[2] It was founded by two childhood friends, nonparties Prieur Leary and Ashton Soniat.[3] Leary and Soniat formed Coinmint as a Delaware limited liability company in August 2016.[4] At the time of formation, Leary and Soniat agreed to be

---

[1] Citations in the form of "PTO —" refer to the Joint Pre-Trial Stipulation and Order, available at Docket Item ("D.I.") 207. Citations in the form of "SQO —" refer the Status Quo Order entered in this matter, available at D.I. 67. Citations in the form of "Am. Compl. —" refer to the Amended Complaint, available at D.I. 16. Citations in the form of "Last Name Tr. —" refer to the trial testimony of the identified witness, available at D.I. 235 and D.I. 236. Citations in the form of "JX —" refer to joint exhibits in the trial record. And citations in the form of "Op. Agr. —" refer to Coinmint's Limited Liability Company Agreement dated November 21, 2016, available at JX 11.

[2] *See* Leary Tr. 10; JX 60 at COINMINT_157338, -157357.

[3] PTO ¶ 12.

[4] *Id.* ¶¶ 9, 13.

Coinmint's equal 50% owners.[5] They memorialized this understanding in, and made it subject to, the terms of Coinmint's Limited Liability Company Agreement dated November 21, 2016 (the "Operating Agreement").[6]

      B.    Leary and Soniat hold their interests in Coinmint via their respective entities: Mintvest and Respondent Coinmint Living Trust ("Respondent" or "CLT"). Leary is president of Mintvest, a Delaware corporation and Coinmint Member.[7] Soniat is the owner and controller of CLT, a Puerto Rican entity and Coinmint Member.[8] Mintvest and CLT are and always have been Coinmint's only Members.[9] While holding the right to vote on certain major decisions,[10] the Company's Members have no "authority or power to act for or on behalf of the Company."[11]

---

[5] *Id.* ¶ 16; JX 4 at COINMINT071041 (acknowledging the agreement that Soniat and Leary "will start out with a 50/50 equity split" and "equally contribute (50/50) capital to the business for the near term"); JX 7 at COINMINT_157136 (explaining the financial terms of Leary and Soniat's initial investments).

[6] *See* Op. Agr.; PTO ¶ 14; *see also* JX 7 at COINMINT_157137 ("Mintvest will be matching the contribution that Ashton made, to the extent that it can. After that point, it will face dilution *pursuant to the agreement*." (emphasis added)); JX 4 at COINMINT071042 (acknowledging that "at some point," Soniat would contribute more capital and that Leary "agreed" to "accept equity dilution as th[at] happens, in a manner that is directly related to the capital put in").

[7] PTO ¶¶ 7, 10.

[8] *Id.* ¶¶ 8, 11.

[9] *Id.* ¶ 9.

[10] *See* Op. Agr. § 4.6.

[11] *Id.* § 3.9.

C. Rather, Coinmint is manager-managed with a Board of Managers (the "Board"), and all actions and decisions taken by the Company flow through the Board.[12]

a. Section 4.3(f) states that "any Board action shall require the approval of a Majority of the Managers then serving on the Board."[13]

b. Sections 4.3 through 4.6 of the Operating Agreement describe (1) how the Managers may take action on the Company's behalf, including at a formal meeting or by written consent, and (2) what vote is required to take such action, including when majority Board approval and majority Member approval are needed.[14]

c. Despite these requirements, the parties did not follow the Operating Agreement's formalities, and instead mutually pursued a fast-and-loose course of operations and documentation.[15] As Leary explained, "our meetings were

---

[12] *See* PTO ¶ 15; Op. Agr. §§ 3.9, 4.3.

[13] Op. Agr. § 4.3(f).

[14] *See id.* §§ 4.3, 4.4, 4.5, 4.6.

[15] *See, e.g.*, JX 28 at 1 (stating with respect to Mintvest's dilution that "[Leary] [did not] think we would actually need any further paperwork on this," as he was "not aware of either Ashton or [him]self wanting to change what it is now," and that this was "[j]ust [Leary's] 2 cents for minimizing documentation, and as we are working on the big enchilada now, there is a very likely chance that within 30 days, we will need to make changes again," and questioning "[w]hy paper something now that has been as it is for months, and then do it again shortly?"); JX 79 at MINTVEST00001945 (stating that Leary thought "it would have been much easier to have one doc that says the monies sent in from Dorado would be treated as a loan, unless there was an agreement to the contrary" because that "[w]ould avoid all of this paperwork," with Soniat responding that he believed "we

3

. . . like this[:]  Ashton and I would get together and agree on certain things and then do them."[16]  Soniat corroborated this statement:

need a clean history of loans"); Leary Tr. 110 (conceding that the Company did not adhere to formalities); *id.* 120 ("She asked me to sign loan documents.  She asked me to sign all kinds of documents.  And usually it wasn't frequent, which is why I answered the other question like I did.  It was more infrequent.  Like, a few times a year I was given a pile of papers or a pile of documents to sign, and just instructed to sign these, don't worry about them.  And, again, Ashton was my friend.  I just trusted Kathleen was doing everything right."); Soniat Tr. 236–37 (referring to Leary's comments regarding minimizing paperwork in JX 28, and stating:  "I would say that summarizes the way Leary liked to do business.  He did not like to document things, he did not like to sign things, and liked to do it very, very casually.  And when, whether it was Kathleen or Mr. Carlton tried to, you know, have him sit down, have a meeting, get things documented, it was always pushed back, and that he's too busy running around the world, working.  He's working 16 hours a day.  He doesn't have time for this, to sign these things or go over these housekeeping issues.  So that's a pretty good summary of the way the business was run."); Carlton Tr. 335 ("Mr. Soniat was being more of a passive investor, I would say, who was simply funding things.  Mr. Soniat wanted things done right, but was largely deferring to Mr. Leary to kind of set the priorities for me and others.  Contrary to kind of how I would normally like to do things, Mr. Leary hated formalities, and it was almost impossible to get focused on administrative matters.  He'd schedule calls with us and other attorneys and not show up.  Overall, he was extremely resistant to prioritizing internal items and structural items.  Whether it was him being overwhelmed or something more nefarious, it was almost impossible to get him to sign or respond to things on those fronts.  He'd actively push us to demote, avoid, delay, or not prioritize such items.  Mr. Soniat was a little easier to get in touch with, but was also hard to chase down at times."); *id.* 336 ("We seemed like we were always trying to catch up and trying to document things after the fact simply because we weren't getting the information ahead of time.  And given the personalities involved, trying to document things even after the fact proved very difficult."); Schneider Tr. 406 (stating that Leary's unwillingness to formally document Company actions was "typical").

[16] Leary Tr. 110.

I think it's pretty clear how things were run. It was run casually. And we had to act very quickly, as displayed in the WhatsApp messages, where he was on the ground, either in China or Upstate New York, and would tell me that, you know, "we need money fast. Sorry for the last notice, but, you know, I can buy $500,000, a million dollars' worth of machines, but if we don't wire the money tomorrow they may not be there."

And so it was a very fluid process, quick, where we had to act. And, as I said, we were on the phone hours and hours per day. So I mean, if he ever wanted to have an official meeting, I would probably find that bizarre, but I would have agreed, for sure.[17]

Leary never complained about the internal lack of formal process at Coinmint, and instead advocated for eschewing formalities and praised the outcomes.[18] It is undisputed that the Company has had no formal Board meetings where minutes were created.[19] And except for written consents executed in November and December 2019 (the validity of which Mintvest disputes), the Board never executed a written consent in lieu of a meeting to authorize Company action.[20]

D.      Under Section 4.1(b) of the Operating Agreement, Mintvest appointed Leary to serve as a Manager and its Board designee; CLT appointed itself to serve as a Manager and Board designee.[21] Under Section 4.2(a), those Managers could be

---

[17] Soniat Tr. 276.

[18] *See, e.g.*, *id.* 276–77.

[19] PTO ¶ 28.

[20] *Id.* ¶ 29.

[21] Op. Agr. § 4.1(b) (stating that the "Coinmint Designee shall be [CLT]" and that the "Mintvest Designee shall be Prieur Leary"); PTO ¶¶ 17, 18.

5

removed, "with or without cause, only by the Member who designated such Manager to serve on the Board."[22]

E.    Since formation, the parties agreed that Leary would run Coinmint's day-to-day operations, and he did so.[23]    While Leary contributed labor and know-how, Soniat and CLT, either directly or through affiliates, contributed significant capital.[24]    The parties dispute how certain CLT cash infusions should be classified (*i.e.*, whether they are capital contributions or loans under the Operating Agreement) and whether those cash infusions diluted Mintvest's stake in the Company.[25]

a.    The Operating Agreement contemplates that cash infusions may take either the form of a loan or capital contribution.[26]    Critically, cash infusions in the form of loans do not have dilutive effect.[27]    Capital contributions do.[28]    Dilutive capital contributions affect each Manager's voting power, which is determined by its appointing Member's respective equity stake:

---

[22] Op. Agr. § 4.2(a).

[23] PTO ¶ 20.

[24] *Id.* ¶ 26.    Soniat's company Dufossat Capital also provided accounting services to Coinmint.  *See id.* ¶¶ 21–24.

[25] *Id.* ¶ 27.

[26] *See* Op. Agr. §§ 3.2, 3.5, 3.6.

[27] *See id.* §§ 3.5, 3.6(f).

[28] *See id.* §§ 3.2, 3.6.

6

Each Manager shall have the voting power equivalent to the Sharing Ratio of the Member that appointed such Manager and, unless otherwise expressly stated in this Agreement, all actions by or requiring the consent or approval of the Board shall require the consent or approval of a Majority of the Board.[29]

b.      Importantly, the Operating Agreement compels the Board to follow certain formalities to effectuate a capital adjustment, and the parties do not meaningfully dispute those formalities. Section 3.2(a) of the Operating Agreement contemplates that if there are "insufficient Available Funds to cover operating deficits or other capital needs of the Company, the Board shall notify the Members in writing of such deficits and other cash needs," after which each Member is required to make an additional capital contribution to the Company.[30] In other words, the Board must determine that a capital call is required, vote to make the capital call, and approve written notice to the Members.[31] The Board must do so in compliance with the Operating Agreement's procedural requirements.[32] Thereafter, the Board must send advance written notice of the call to the Members.[33]

---

[29] *Id.* § 4.3(e). The "Sharing Ratio" refers to Mintvest and CLT's respective ownership percentages in accordance with Section 3.7 of the Operating Agreement, which "may change from time to time as provided in th[e] [Operating] Agreement." *Id.* § 1(rrr). The Sharing Ratio is subject to Section 3.2, which governs dilution. *See id.* §§ 3.2, 3.6, 3.7.

[30] *See id.* § 3.2(a).

[31] *See id.*

[32] *See id.* § 4.4 (stating that Board action must be taken at a meeting or by written consent).

[33] *See id.* § 3.2(a).

7

c.　Each Member has the right to match its counterpart's capital contributions to avoid dilutive effect. If a Member fails to make a required capital contribution, the other Member may make that contribution, and the parties' respective equity percentages will be immediately adjusted to reflect the disparate contributions.[34] Such adjustments shall be "effective as of the date the amount requested under [Section 3.2(a)] was due," and "shall be made by the Board in good faith."[35] The Board should provide notice of any adjustment to the diluted Member, but failure to do so does not nullify the dilution.[36]

F.　From the outset, the parties anticipated that Soniat and CLT would contribute more cash to the Company over time, diluting Mintvest's ownership. For example, Leary stated to Soniat,

> At some point, given your financial resources are great[er] than mine, it is contemplated you will contribute more. It is agreed that I accept equity dilution as this happens, in a manner that is directly related to the capital put in. Long story short, it is my hope that this is a big success and I am a minority interest holder here.[37]

---

[34] *See id.* § 3.2(a)(1)–(2) (discussing the consequences of a Member's failure to make any required additional capital contribution, namely a "Failed Contribution").

[35] *Id.* § 3.2(a)(2).

[36] *See id.*

[37] JX 4 at COINMINT071042; Leary Tr. 77; *see also* JX 5 at COINMINT065914 ("We are equal as long as our contributions are equal. If one contributes more, then the other will have the option to match it. If no match, then dilution will occur. My suggestion is to have meetings at least quarterly (or more often by request) to effect dilution, meet strategically on company direction, and decide distributions."); JX 7 at COINMINT_157137 ("Mintvest will be matching the contribution that Ashton made, to the extent that it can. After that point, it will face dilution, pursuant to the agreement.").

As Coinmint expanded, Leary requested from Soniat, and Soniat provided, funds to support the Company's operations;[38] neither Mintvest nor Leary provided funds aside from an initial contribution.[39] By the end of 2016, Soniat's capital contributions diluted Mintvest's interest to 5.5%.[40] By early 2017, it was reduced even further.[41] But consistent with the Company's internal practice of disavowing formal procedures, there exist no Board minutes reflecting a Board vote authorizing a capital call; no written consent in lieu of a meeting authorizing a capital call; and no notice of a capital call sent to Members.[42]

G. Throughout 2017, Leary and Soniat negotiated Mintvest's equity stake.[43] Leary felt that Mintvest should not have been diluted so significantly because Leary had contributed significant "sweat equity."[44] Soniat agreed, and the parties discussed an adjustment over the next several months.[45] In October 2017,

---

[38] *See, e.g.*, JX 1 at 1386, 1390, 1397, 1398, 1420, 1425, 1426, 1437, 1465, 1473, 1504, 1534, 1542; Leary Tr. 95–97, 107–08; Soniat Tr. 211–12, 217, 290.

[39] *See* Leary Tr. 77; Soniat Tr. 211–12.

[40] *See* JX 15 at COINMINT_157205; JX 64A at COINMINT_157468.

[41] *See* JX 124 at 2.

[42] *See* PTO ¶¶ 28–29.

[43] *See* Leary Tr. 118.

[44] Soniat Tr. 223; *see also* Leary Tr. 118; Carlton Tr. 336–37.

[45] *See, e.g.*, Soniat Tr. 223; Leary Tr. 118; Carlton Tr. 336–38.

9

the parties agreed to "peg" Mintvest's interest at a higher percentage.[46] Soniat proposed to "suspend the rebalancing of equity and peg ownership at 85/15."[47] Leary pointed out that the last equity statement he received showed Mintvest's equity "at 18.x%" and that he "reviewed it and it seemed accurate."[48] Leary stated that "if it is accurate, I would prefer 18% to 15%."[49] Leary was "fine with the concept of pegging equity permanently," but the parties "just need[ed] to finalize the amount."[50] Thereafter, Leary and Soniat agreed to peg Mintvest's equity stake at 18.2%,[51] and Soniat agreed that he would only fund the Company with loans going forward, so as to avoid Mintvest's further dilution.[52] Leary expressed his satisfaction with this arrangement.[53]

---

[46] *See* JX 27 at COINMINT155291 ("We are going to suspend the rebalancing of equity and peg ownership at 85/15."); JX 28 at 1–4 (reflecting that the parties extensively discussed pegging equity at 85/15).

[47] JX 28 at 3; JX 27 at COINMINT155291; *see also* Carlton Tr. 340–41, 343–44.

[48] JX 28 at 1.

[49] *Id.*

[50] *Id.* at 4.

[51] *See, e.g.*, JX 25; JX 32; Leary Tr. 135–36; Soniat Tr. 222–24, 232, 235–36; Schneider Tr. 406–07.

[52] *See* Soniat Tr. 227–28.

[53] *See id.*; *see also* JX 1 at MINTVEST00001473 (stating in a text from Leary to Soniat that Soniat's lending money to the Company "is really invaluable").

a.	In keeping with Leary's general distaste for paperwork, Leary said that the agreement did not need to be documented.[54]  Nonetheless, the parties memorialized this agreed-to equity split in a Statement of Changes in Partners' Equity backdated to August 31, 2017 (the "October 2017 Agreement").[55]  Leary signed the October 2017 Agreement, and did not suggest or demand that a Board meeting was required to make the 18.2% equity split official.[56]  Thus, as with every other Company decision, no formal board meeting or written consent was executed memorializing the October 2017 Agreement.

b.	A series of documents executed after the October 2017 Agreement reflect the agreed-to 81.8% to 18.2% equity split.[57]  Leary admits that he received these documents and did not protest Mintvest's equity pegged at 18.2%.[58]

---

[54] JX 28 at 1 ("I don't think we would actually need any further paperwork on this. . . . Just my 2 cents for minimizing documentation . . . . Why paper something now that has been as it is for months, and then do it again shortly?").

[55] *See* JX 25; *see also* JX 32; Schneider Tr. 406–07.

[56] *See* Leary Tr. 115 (admitting that he never requested a formal Board meeting with Soniat); *id.* 120–22 (admitting that he felt "Ms. Schneider was a bit of a pain in the ass" because she was asking him to sign documents); *id.* 135–36 (admitting that he signed the documents reflecting Mintvest's 18.2% ownership and never requested a Board meeting to make it "official"); Soniat Tr. 275 (explaining that "the word 'board meeting' was never mentioned until he sued me in Delaware"); *see also* Carlton Tr. 335 (explaining that "Leary hated formalities"); Schneider Tr. 406 (stating that it was "very normal" for Leary to forego formalities).

[57] *See* JX 30; JX 31; JX 59; JX 64A; JX 97; JX 301; JX 302.

[58] *E.g.*, Leary Tr. 137–40, 146–48.

11

c. Mintvest's 18.2% ownership was also confirmed through the Company's 2018 financial statements. In performing an audit, the Company's accountants realized that Leary and Mintvest never made a particular equity contribution of 14.001 Bitcoins with a market value of $155,143.68.[59] Without that contribution, Mintvest's equity would be further diluted to approximately 10.69%.[60] The accountants asked Leary about the "[e]quity question" to complete the audit.[61] Leary responded on May 2, 2019: "With regards to the equity, it is the same as the spreadsheet that Kathleen prepared, that I sent you a few days ago (18.2% for Mintvest, the rest in Ashton's entity)."[62] The referenced "spreadsheet" was a version of the October 2017 Agreement.[63] The accountants adjusted the Company's books to support Mintvest's 18.2% ownership.[64]

---

[59] *See* JX 85 at COINMINT_158126.

[60] *See* JX 124 at 2.

[61] JX 88 at COINMINT000025 (referring to the outstanding "equity question"); JX 85 at COINMINT_158126 (evidencing that the "equity question" referred to Mintvest's further dilution).

[62] JX 88 at COINMINT000024; *see also* JX 87.

[63] Leary Tr. 147–48 (discussing JX 87 and JX 88). JX 87 reflects that Leary forwarded Kathleen Schneider's October 18, 2017 email containing the October 2017 Agreement to the auditors on April 29, 2019, four days after they inquired about Leary's equity contributions. *Compare* JX 87 at COINMINT_158101, *with* JX 85 at COINMINT_158126.

[64] *See* JX 88 at COINMINT000020–000023.

d.     On August 9, 2019, Leary once more confirmed that he was "100% comfortable with" Mintvest's equity pegged at 18.2%.[65] He also recognized that, compared to CLT, Mintvest "do[es]n't have as much skin in the game, in terms of capital value . . . (in terms of percentages)," and that "there can be only one boss, and that is [Soniat]."[66] Twelve days later, Leary once more recognized Mintvest's 18.2% stake and attempted to use it as leverage: after further discussions, Leary proposed that he be given an option to exit his position as "a minority equity holder."[67] Yet, in this litigation Mintvest seeks equitable relief in this Court based on the assertion that Mintvest continues to hold 50% of the Company.[68]

H.     Wielding its purported 50% interest, Mintvest also seeks an order declaring that Coinmint was invalidly converted to a Puerto Rican entity and an order nullifying the conversion.[69] On or about January 19, 2018, the Company filed a Certificate of Conversion with the Delaware Secretary of State and the Secretary of State (the "Conversion").[70] On January 25, Coinmint domesticated in Puerto Rico.[71]

---

[65] JX 99 at COINMINT011920; *see also* Leary Tr. 155 (testifying that, as of early August 2019, he believed that Mintvest held 18.2% and was content with that percentage).

[66] JX 99 at COINMINT011920.

[67] JX 101 at COINMINT130734.

[68] *See* Am. Compl. ¶¶ 102, 111, 123.

[69] *See id.* ¶¶ 102–06.

[70] PTO ¶ 30; JX 48.

[71] PTO ¶ 30; JX 49.

13

As of that date, Coinmint became and was thereafter operated as a Puerto Rican entity.[72] Mintvest contests the Conversion, pushing that Leary was unaware of the Conversion until September 2019 and that the Conversion is invalid because Leary never authorized it on Mintvest's behalf.[73] Contrary to his assertion that he was unaware of the redomestication until "around September of 2019,"[74] the record demonstrates that Leary was fully aware of the Conversion.[75]

---

[72] *See* JX 48; JX 49.

[73] *See* PTO ¶ 30 ("Petitioner contests whether the Conversion was properly authorized."); Leary Tr. 58 (testifying that he was unaware of the Conversion until September 2019 "when [he] started kind of questioning a lot of the things that were going on in the company"); Am. Compl. ¶ 103 ("Neither Mr. Leary nor any other representative of Mintvest ever authorized the conversion.").

      The Operating Agreement does not specify a manner of authorizing a conversion. Therefore, pursuant to 6 *Del. C.* § 18-216(b), a conversion "shall be authorized in the same manner as is specified in the limited liability company agreement for authorizing a merger or consolidation that involves the limited liability company as a constituent party to the merger or consolidation." Section 4.6 of the Operating Agreement requires "consent of a Majority of the Members" to approve a merger. Op. Agr. § 4.6(c). This is consistent with the default rule under the LLC Act, which provides that, if the relevant operating agreement does not address approvals for conversions or mergers, "the conversion shall be authorized by the approval by members who own more than 50 percent of the then current percentage or other interest in the profits of the domestic limited liability company owned by all of the members." 6 *Del. C.* § 18-216(b).

[74] Leary Tr. 58 ("Q. . . . Are you aware, sir, currently, that in January 2018, Coinmint was converted from a Delaware LLC to a Puerto Rican LLC? A. I am now. Q. When did you first become aware of that? A. I'm not exactly sure of the time. I believe it was around September of 2019 when I started kind of questioning a lot of the things that were going on in the company.").

[75] *See, e.g., id.* 58–59 ("Q. Were there discussions in 2017 about having Coinmint take advantage of certain Puerto Rico tax laws? A. Yes."); *id.* 192–93 (confirming Leary had received documents evidencing the Conversion prior to September 2019, and conceding that he never protested in any way Coinmint's redomestication as a Puerto Rican entity before filing this action); Schneider Tr. 412 ("A. When I look back, it was always known

a. As early as February 2017, Leary was engaging with Puerto Rican tax counsel.[76] Thereafter, Leary was actively involved in the Company's efforts to gain Puerto Rican tax protections.[77] In conjunction with those tax efforts, the Company considered redomestication as a Puerto Rican entity; Leary was actively involved in that process, participating in numerous discussions with the accountants and lawyers.[78]

---

that Coinmint was going to eventually move to Puerto Rico. Whether it was going to be an Act 20 company or not was not decided initially. I think there was a lot of tax reviews done by external consultants. But, officially, it did become clear that they decided to move forward with it, and the final decision came in around December or November 2017. And then it actually officially happened in January of 2018. Q. Who was spearheading the efforts for the Puerto Rican conversion? A. Back early on, I was doing a lot of legwork with it, as far as getting the external tax advisors organized. And then the actual conversion, Mr. Leary took over the lead, and I just was the support background.").

When faced with this record, Leary attempted to maintain that he was unaware of Coinmint's Conversion and redomestication in Puerto Rico until September 2019. The paper record, as well as the testimony of credible witnesses, undermine Leary's position. Accordingly, I do not find Leary's testimony credible as to the Conversion.

[76] *See* JX 20; Leary Tr. 58–59, 162–63.

[77] *E.g.*, JX 38; JX 40; JX 41; JX 53; JX 56; JX 57; JX 59; JX 61; JX 68; JX 69; JX 71.

[78] *See, e.g.*, Carlton Tr. 339–40 ("The idea was that Coinmint was going to relocate to Puerto Rico and become a Puerto Rican entity, and that it would seek to minimize taxes there under a favorable tax provision known as Act 20. And North Country Data Center would handle much of the New York operations. There were substantial discussions about whether that could be done and how do it appropriately. Mr. Soniat was somewhat cautious. He wanted legal opinions from large, respected law firms and CPA firms. Mr. Leary was more kind of in 'damn the torpedoes' mode. He wanted the conversion to the Puerto Rican entity done immediately and the Act 20 application done as quickly as possible. In particular, he wanted it done before we did a securities token offering that they were planning."); *id.* 349 ("I had multiple discussions with Mr. Leary and Mr. Soniat about the Act 20 application, the redomestication in Puerto Rico, which were related to one another. We had numerous conversations with Deloitte and other kind of larger law firms or CPA firms. Mr. Leary participated in those discussions and, in many instances, fought

b.     Leary participated in April and May 2018 discussions with tax professionals, which explicitly acknowledged that "based on Coinmint's facts, as they stand today, the Puerto Rican company has a US trade or business, meaning that any income from its business operations would be subject to US income taxation,"[79] and that "Coinmint Puerto Rico filed an election to be taxed as a partnership for US tax purposes."[80]

c.     And in June 2018, Leary received a memorandum from the Company's tax advisors that reiterated the 81.8%-18.2% equity split and contained an extensive discussion about "Coinmint's Re-domiciliation to Puerto Rico."[81]

d.     Throughout 2018 and 2019, Leary was also spearheading the preparation of an Offering Memo, or "White Paper," to be used in conjunction with

---

with those attorneys and CPAs. I also had multiple one-on-one conversations with Mr. Leary and Mr. Soniat. Mr. Leary, in particular, wanted the company to be a Puerto Rican entity and was kind of pushing for that to be done ASAP. The process of doing the filings dragged out because of delays with the service we hired to complete it. Mr. Leary continually, and sometimes daily, was asking if the domestication had been completed yet, and how we could speed it up or light a fire. Mr. Leary was also planning to move to Puerto Rico.").

[79] JX 56 at COINMINT_157229 (identifying Coinmint as a Puerto Rican entity in April 2018) & COINMINT_156296 (showing that Leary responded to the email identifying Coinmint as redomesticated); *see also* JX 53 at COINMINT_158462 (stating in a March 2018 email delivered to Leary that "tax counsel told us that going from one jurisdiction (DE) to another (PR), did not require a new EIN").

[80] JX 57 at COINMINT_157305; *accord* JX 59 at COINMINT_157313, -157315.

[81] JX 59 at COINMINT_157312, -157317–157328; *see also* Leary Tr. 170–71.

16

a proposed offering of bitcoin tokens.[82]  The White Paper, dated August 2018, expressly states under the heading "Corporate Structure & Ownership" that "Coinmint, LLC was formed as a Delaware limited liability company in 2016 and reorganized as a Puerto Rican Puerto Rico limited liability company in early 2018."[83]

     e.     In spring 2018, on behalf of the Company, Leary negotiated a collaboration agreement.[84]  Both the draft agreement and the final version Leary signed on Coinmint's behalf state that Coinmint is a Puerto Rican limited liability company.[85]

     f.     In July 2019, Leary, acting and signing as President of Coinmint, caused the Company to file a Form D with the Securities and Exchange Commission in connection with a proposed exempt offering of securities.[86]  The Form D provides that the "Jurisdiction of Incorporation/Organization of Coinmint, LLC" is "PUERTO RICO."[87]

---

[82] *See* JX 60; Leary Tr. 170–72; Soniat Tr. 245.

[83] JX 60 at COINMINT_157348; *see also* Leary Tr. 172.

[84] *See* Leary Tr. 182.

[85] *See* JX 303 at COINMINT118537 (stating in a draft of the collaboration agreement attached to an email from Leary that Coinmint is a "Puerto Rican limited liability company"); JX 304 at COINMINT145499 (stating in the final collaboration agreement attached to an email from Leary that Coinmint is a "Puerto Rican limited liability company").

[86] *See* JX 97 at 1, 2, 5.

[87] *Id.* at 1.

g.  Finally, in November 2018, Leary received an email from an attorney representing the Company.[88]  That email asked whether Leary "originally organize[d] Coinmint as a Delaware LLC," and went on to explain, "That is what the contract says and also the PR certificate of incorporation is dated as of January 2018, so I guess you converted to a PR entity.  If that is so, please confirm and send me a copy of the conversion documents."[89]  Leary thereafter confirmed the Conversion, asking the Company's controller to forward a copy of the requested conversion documents; she did, copying Leary.[90]

I.  Leary and Soniat's relationship deteriorated over time, taking its toll on Coinmint.  By 2019, Leary and Soniat disagreed as to how the Company should be run and managed.[91]  Soniat believed that Leary was struggling to keep things afloat and therefore installed a CFO and COO to ensure the Company would be managed more professionally.[92]  Leary did not respond well to these changes.[93]  At the same time, Soniat learned about other problems related to Coinmint's business and

---

[88] *See* JX 73; Leary Tr. 189–90.

[89] JX 73 at COINMINT000056.

[90] *See id.*

[91] *See* Soniat Tr. 249–51.

[92] *See id.*

[93] *See id.*

management, including, *inter alia*, that Leary had been hiding the Company's bills from management and others.[94]

J.      Accordingly, on December 2, 2019, CLT, as Coinmint's 81.8% Manager and 81.8% Member,[95] approved resolutions (i) amending the Operating Agreement to provide that "[a] majority of the members shall determine the composition of the Board, and that "[a]ny Manager may be removed from the Board with or without cause by a Majority Vote of the Members";[96] (ii) removing Leary from the Board under those amended terms;[97] and (iii) designating CLT as Coinmint's sole Manager.[98]

K.      CLT and Mintvest, via Leary and Soniat, are not able to continue working together on day-to-day tasks going forward.[99]

L.      Petitioner filed this action against Respondent in December 2019.[100] On March 2, 2020, Petitioner filed the operative Amended Complaint, seeking to

---

[94] *See id.* 251–52, 269–70, 272–73; *see also* JX 99 at COINMINT011920; JX 101 at COINMINT130734; JX 102 at COINMINT000030–000031.

[95] *See* JX 108 at COINMINT_157544 (indicating that CLT effectuated the resolution with "81.8% Voting Rights"); JX 109 at COINMINT_157545 (same); JX 110 at 1 (same). Under the Operating Agreement, each Manager's voting power is the same as the equity interest of the Member who appointed that Manager.  Op. Agr. § 4.3(e).

[96] JX 109 at COINMINT_157545.

[97] JX 108 at COINMINT_157544; PTO ¶ 31.

[98] JX 110 at 1; PTO ¶ 31.

[99] PTO ¶¶ 32, 33.

[100] *See* D.I. 1.

nullify Coinmint's conversion to a Puerto Rican entity; determine Coinmint's proper Managers pursuant to 6 *Del. C.* § 18-110; and dissolve Coinmint and appoint a liquidating trustee.[101] Respondent moved to dismiss, asserting in part that this Court lacked jurisdiction over Coinmint as a Puerto Rican entity.[102] I cautiously denied Respondent's motion, pointing out that "the factual and legal findings and ruling on the conversion claim and the related ownership claim are the gatekeepers for whether the alternative claim seeking dissolution of a Puerto Rican entity is even reached," and that "it would be inappropriate for me to dismiss that claim when it's possible that the gatekeeping claims will be found to result in a Delaware entity over which this court does have subject matter jurisdiction."[103] Respondent answered the Amended Complaint, asserting as affirmative defenses, *inter alia*, that Petitioner's claims are barred by unclean hands; that Petitioner's claims are barred by waiver and estoppel; and that the Court lacks jurisdiction over the Company.[104]

M.    I entered a status quo order on May 19, 2020 (the "SQO").[105] Taking Mintvest's allegations in the Amended Complaint as true, and following the practice

---

[101] *See* Am. Compl. ¶ 1.  Count I seeks to nullify the Conversion.  *See id.* ¶¶ 100–06. Count II seeks dissolution pursuant to 6 *Del. C.* § 18-802, or alternatively, equitable dissolution.  *See id.* ¶¶ 107–17.  Count III seeks a declaration of the Company's proper managers pursuant to 6 *Del. C.* § 18-110.  *See id.* ¶¶ 118–28.

[102] *See* D.I. 20; D.I. 34.

[103] *See* D.I. 55 at 57–58.

[104] *See* D.I. 46 at 52–53.

[105] *See generally* SQO.

of retaining the apparent incumbent in managerial control pending resolution of a control dispute,[106] the SQO keeps Leary at Coinmint's helm beside CLT during this litigation. It requires, among other things, that the parties comply with the terms of the Operating Agreement.[107] It also provides that, "upon a showing of good cause," the Court may modify the SQO's terms,[108] and that the SQO shall remain in full force and effect "until such time as this Court specifically orders otherwise."[109] Throughout the action's pendency, both parties filed several motions to enforce the SQO.[110] Those motions invoked recurring themes, behaviors, and legal issues; required that the Court repeatedly chastise the parties for contumacious behavior; killed many trees; and sapped the Court's time and resources. Many motions were well-founded; Soniat struggled to observe corporate formalities in funding the Company's operations, and Leary divulged confidential Company information and interfered with Company operations in an attempt to steer the Company in his preferred direction.

---

[106] *See Pharmalytica Servs., LLC v. Agno Pharm., LLC*, 2008 WL 2721742, at *3 n.6 (Del. Ch. July 9, 2008) ("As the label suggests, status quo orders, in the usual case, provide for incumbents to continue in office.").

[107] *See* SQO ¶ 1.

[108] *Id.* ¶ 6.

[109] *Id.* ¶ 7.

[110] *E.g.*, D.I. 299; D.I. 297; D.I. 292; D.I. 293; D.I. 274; D.I. 261; D.I. 232; D.I. 231; D.I. 214; D.I. 212; D.I. 209; D.I. 206; D.I. 200; D.I. 195; D.I. 177; D.I. 176; D.I. 174; D.I. 165; D.I. 155; D.I. 148; D.I. 146; D.I. 141; D.I. 140; D.I. 134; D.I. 131; D.I. 128; D.I. 123; D.I. 116; D.I. 108; D.I. 103; D.I. 102; D.I. 93; D.I. 88; D.I. 81.

N.     The matter proceeded through discovery to trial, which I held on February 2 and 3, 2021.[111]  The parties submitted post-trial briefing,[112] and I heard post-trial argument on April 20.[113]

O.     With the matter close to resolution, the parties' spats over the SQO continued.  Respondent moved to enforce the SQO and thereafter to modify it.[114]  In response, Petitioner opposed those motions, and also moved to enforce the SQO against Respondent.[115]  On May 7, I heard argument on the competing SQO motions.[116]  I granted Respondent's motion and denied Petitioner's motion, but took the requests to modify or vacate the SQO under advisement.[117]  In a two-step intended to expedite finality and steady the Company, I am issuing this order in advance of a post-trial opinion setting forth more detailed findings of fact and conclusions of law, and a final order of judgment.

**IT IS HEREBY ORDERED** this 18th day of May, 2021:

1.     Judgment will be entered in Respondent's favor on all counts.  The preponderance of the evidence establishes that Mintvest was legally, validly, and

---

[111] *See* D.I. 235; D.I. 236.

[112] *See* D.I. 270; D.I. 278; D.I. 282; D.I. 823.

[113] *See* D.I. 298.

[114] *See* D.I. 261; D.I. 274.

[115] *See* D.I. 291.

[116] *See* D.I. 303.

[117] *See id.*

voluntarily diluted to an 18.2% minority Member in October 2017. While the parties did not adhere to the Operating Agreement's formalities in effectuating that dilution, Leary actively waived Mintvest's right to avail itself of those protections.[118] As a result of Mintvest's minority status, CLT had the authority to amend the Operating Agreement; remove Leary as Manager; and install CLT as Coinmint's sole Manager. Further, the record demonstrates that the Conversion was valid pursuant to Section 4.6 of the Operating Agreement, and that Leary was an active participant in executing the redomestication plan. Coinmint became a Puerto Rican entity. Petitioner has failed to establish a basis to support the extreme remedy of dissolution. A forthcoming opinion will set forth the legal underpinnings of these conclusions.

---

[118] The Operating Agreement's "No Waiver" provision does not preclude this outcome. It reads:

> No waiver, express or implied, by any Member of any breach or default by any other Member in the performance by the other Member of its obligations hereunder shall be deemed or construed to be a waiver of any other breach or default under this Agreement. Failure on the part of any Member to complain of any act or omission of any other Member, or to declare such other Member in default irrespective of how long such failure continues, shall not constitute a waiver hereunder. No notice to or demand on a defaulting Member shall entitle such defaulting Member to any other or further notice or demand in similar or other circumstances.

Op. Agr. § 11.13. Petitioner tortures the plain reading of this provision to secure an unsupported outcome. Leary did not sit idly by and "fail[] to complain" about the parties' noncompliance with the Operating Agreement's terms. To the contrary, he was an active participant in shirking those terms and spearheaded the intra-Company campaign against formalities.

2.     The Status Quo Order is hereby **VACATED**.  "Once [a] status quo order is in place, the party seeking modification bears the burden of showing why it should be modified."[119]  The SQO binds the parties until this Court enters a final judgment in the matter or specifically orders otherwise upon good cause shown.[120] As with the decision to enter a status quo order, the decision to order otherwise is "within the discretion of the trial judge."[121]

> In deciding whether to modify or vacate a status quo order, it is proper for the court to assess whether the facts or circumstances justifying the initial restraint have changed.  This includes whether there is a basis to reconsider the court's initial determination that the plaintiff demonstrated . . . a . . . likelihood of success on the merits.[122]

"This result, in my view, is driven by commonsense as well as our law," as "[s]tatus quo orders routinely provide for modifications, implying that circumstances in the company's operation or management may change during the progress of litigation and that such changes properly should be reflected in the Order."[123]  It is

---

[119] *R&R Cap. LLC v. Merritt*, 2013 WL 1008593, at *8 (Del. Ch. Mar. 13, 2013) (citing *Conn. Gen. Life Ins. Co. v. Pinkas*, 2010 WL 4925832, at *2 (Del. Ch. Nov. 18, 2010)).

[120] *See Eagle Force Hldgs., LLC v. Campbell*, 235 A.3d 727, 743–45 & n.85 (Del. 2020); *R&R Cap.*, 2013 WL 1008593, at *8; *Frankino v. Nat'l Auto Credit, Inc.*, 1999 WL 959188, at *1 (Del. Ch. Sept. 28, 1999); *see also* SQO ¶¶ 6–7.

[121] *R&R Cap.*, 2013 WL 1008593, at *8.

[122] *Germaninvestments AG v. Allomet Corp.*, 2019 WL 2236844, at *10 (Del. Ch. May 23, 2019) (footnote omitted) (citing *United Bhd. of Carpenters Pension Plan v. Fellner*, 2014 WL 1813280, at *1 & *2 (Del. Ch. May 1, 2014)), *aff'd in part, rev'd in part on other grounds*, 225 A.3d 316 (Del. 2020).

[123] *Frankino*, 1999 WL 959188, at *1.

unreasonable "to treat the status quo order as akin to a document of legal title," as such orders simply "identify the [managers] who shall manage the company as a means of reassuring shareholders and markets that someone has the legal right to manage the daily affairs of the company until the Court of Chancery resolves the § [18-110] action."[124] The SQO "is a practical instrument intended to operate in a practical manner."[125]

3. Here, trial has shown that Mintvest was lawfully diluted and therefore lost its authority to make outcome-determinative decisions for the Company. CLT, as the Company's majority holder, was within its rights to remove Leary as Manager in December 2019. The facts and circumstances justifying the initial restraint have changed; the record has eviscerated the influence and weight previously afforded to the Amended Complaint's allegations, which formed the basis for maintaining the status quo as Leary believed it to be. In view of my post-trial finding that Leary has no rightful claim to Coinmint's management, there is good cause to vacate the SQO before entry of a final judgment, as it would be improper to permit Leary to retain managerial power of which he was lawfully and validly divested. And the record to date, including CLT's recent and well-founded claims that Leary continues to violate the SQO, supports the conclusion that allowing Leary to retain control via the SQO

---

[124] *Id.*

[125] *Id.*

risks irreparable harm to Coinmint; rewards his continued contemptuous actions and effort to disrupt Coinmint's business; and flies in the face of the record established at trial. Accordingly, even though the SQO will expire on its own terms upon entry of a final judgment, the SQO is **VACATED**.

/s/ Morgan T. Zurn
Vice Chancellor Morgan T. Zurn
